(No. 50142

HARRIET WALSKI, Appellant, v. MARVIN TIESENGA
*et al.*, Appellees.

*Opinion filed September 19, 1978.*

Silberman & Gershon, Ltd., of Chicago (Jules S. Gershon and Richard J. Hollander, of counsel), for appellant.

Bernard E. Harrold and Donald M. Flayton, of Chicago (Wildman, Harrold, Allen & Dixon, of counsel), for appellees.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

This appeal involves an action in malpractice against two doctors, Marvin Tiesenga and James Walsh, for personal injuries arising from the alleged negligence of the doctors during an operation on plaintiff's thyroid gland in which her left recurrent laryngeal nerve was cut. The case was tried before a jury in the circuit court of Cook County. At the close of the plaintiff's case in chief, the defendants moved for a directed verdict contending that plaintiff had failed to present evidence that the defendants' actions did not conform to the standard of care in the medical community. The trial court directed a verdict in favor of the defendants. The appellate court affirmed on the ground that plaintiff had failed to establish the requisite professional standard of care against which the defendants' conduct was to be judged. (53 Ill. App. 3d 57.) We allowed plaintiff's petition for leave to appeal to this court (65 Ill. 2d R. 315). After viewing all the evidence in its aspect most favorable to plaintiff, as mandated by *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, we agree that the trial court did not

err in directing a verdict for defendants.

The evidence is set forth at length in the opinion of the appellate court and need not be restated in detail here. The plaintiff, Harriet Walski, had a long-standing history of problems with her thyroid gland. In 1949 she underwent thyroid surgery subsequent to which she received radioactive iodine treatment and took thyroid pills on an irregular basis. Dr. Walsh, a general practitioner, had treated plaintiff for an unrelated ailment prior to July 1971. During an office visit on July 19, 1971, Dr. Walsh detected that plaintiff's thyroid gland was enlarged and was pressing on her trachea. The enlarged thyroid interfered with plaintiff's breathing. Dr. Walsh arranged for Dr. Tiesenga, a general surgeon, to perform a subtotal thyroidectomy on November 30, 1971. Dr. Walsh assisted in the surgery. After surgery, plaintiff experienced problems in breathing and speaking.

Plaintiff called Dr. Tiesenga as an adverse witness under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 60). He indicated that a recurrent laryngeal nerve lies on either side of the thyroid gland. If that nerve is severed, cut or crushed, paralysis of the vocal chords would be expected. Dr. Tiesenga testified that prior to surgery he was aware of plaintiff's medical history and, in particular, the fact that she had had prior surgery on her thyroid gland. He testified that as a result of the prior surgery and radioactive treatment, there was scar tissue or adhesions around the gland and that the anatomical landmarks used to locate the recurrent laryngeal nerves were not in their normal positions, although the nerves themselves would be more or less in their usual locations. Plaintiff's gland was markedly swollen. Dr. Tiesenga identified the right recurrent laryngeal nerve. He stated he made no attempt to identify the nerve on the left but, in removing tissue from the left side of the gland, made a wide cut so as to avoid the area where the nerve might

possibly be. Dr. Tiesenga testified that basically it is better practice to identify the nerve when doing an extensive thyroidectomy, certainly in the case of a thyroid which had never been operated upon before. According to the testimony, however, plaintiff's thyroidectomy was the most difficult thyroid surgery which can be performed. Because plaintiff's gland was very large and firmly adherent to the surrounding structures and because the nerve is a delicate structure which could be damaged in the process of identifying it, Dr. Tiesenga determined it was more prudent to avoid the area where the nerve might possibly be, rather than try to identify it. Dr. Tiesenga also indicated he agreed with the textbook procedure of first exposing and identifying the recurrent laryngeal nerve in those cases where the patient had had no previous thyroid surgery.

Plaintiff also called Dr. Walsh under section 60 of the Civil Practice Act. He testified that because the scarring and adhesion were so massive it was unsafe to expose the left recurrent laryngeal nerve. When asked if Dr. Tiesenga's procedure of identifying the right nerve and not identifying, but skirting, the left nerve was good practice when compared to the standards of the medical community, Dr. Walsh responded, "I wouldn't know what else he could have done."

Subsequent to the surgery plaintiff was examined by Dr. Leonard Saxon, her family physician, and Dr. Ronald Kowal, a specialist in the field of otolaryngology. Both doctors diagnosed that plaintiff had permanent vocal-chord paralysis, bronchitis, and tracheitis. During trial, Dr. Kowal indicated that he was familiar with the technique in performing thyroid surgery. When asked by plaintiff's attorney whether he had any opinion as to whether or not in performing thyroid surgery it is customary to identify the laryngeal nerve, Dr. Kowal responded, "There are many procedures on the thyroid, and in some cases, you

have to identify the nerve, and in other cases, you do not."

Dr. David M. Berger testified as an expert witness on plaintiff's behalf. He examined plaintiff in January of 1976 and found vocal-chord paralysis. His direct testimony concerning acceptable procedures for thyroid surgery was that "in my feeling the standards by which I feel are acceptable practice, one must identify and preserve the recurrent laryngeal nerves on all occasions." On cross-examination Dr. Berger testified that there are always options available in surgery but that in his own mind it was not a proper option to skirt the left recurrent laryngeal nerve. He stated he could not testify generally but only "on the basis of my own opinion as to what I consider a proper option." When asked on cross-examination if there existed a contemporary school of surgeons that will skirt the nerve when they encounter a host of adhesions, Dr. Berger responded that "in the institutions in which I trained that is not the teaching. And I can't speak for other institutions or other areas of training. I can only speak for my own." Defense counsel read a quotation to Dr. Berger from a medical textbook which indicated that there existed a certain amount of controversy in the medical community concerning deliberate exposure of the laryngeal nerve. The quotation concluded with the remark that the situation remained one in which each surgeon will find the approach which suits him best. Dr. Berger indicated that he did not fully agree with that statement, but indicated the decision whether or not to expose the nerve depends on the surgeon and the technique and care he uses. Dr. Berger stated that "[e]verybody who is a certified surgeon doesn't use the same methods, obviously."

One element of a cause of action for medical malpractice is proof of the standard of care by which the defendant physician's conduct is to be measured. (*Anderson v. Martzke* (1970), 131 Ill. App. 2d 61, 65; see *Darling*

*v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 330-32; Illinois Pattern Jury Instructions, Civil, No. 105.01 (2d ed. 1971) (herinafter cited as IPI Civil); see also, *e.g., Davis v. Virginian Ry. Co.* (1960), 361 U.S. 354, 357, 4 L. Ed. 2d 366, 369, 80 S. Ct. 387, 389; *Larsen v. Yelle* (1976), 310 Minn. 521, 523, 246 N.W.2d 841, 844; *Kortus v. Jensen* (1976), 195 Neb. 261, 268, 237 N.W.2d 845, 850; *Bruni v. Tatsumi* (1976), 46 Ohio St. 2d 127, 131, 346 N.E.2d 673, 677; *Versteeg v. Mowery* (1967), 72 Wash. 2d 754, 755, 435 P.2d 540, 541.) As this court recognized in *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423, the appellate decisions in this State have held that the plaintiff in a medical malpractice action generally must establish the standard of care through expert testimony. The plaintiff must then prove that, judged in the light of these standards, the doctor was unskillful or negligent and that his want of skill or care caused the injury to the plaintiff. *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423; see IPI Civil No. 105.01.

Generally, expert testimony is needed to support a charge of malpractice because jurors are not skilled in the practice of medicine and would find it difficult without the help of medical evidence to determine any lack of necessary scientific skill on the part of the physician. (See IPI Civil No. 105.01, Comment at 321; *Baoust v. Kraut* (Del. 1977), 377 A.2d 4, 6-7; J. Dooley, Modern Tort Law sec. 34.31, at 517 (1977).) However, in those situations where the physician's conduct is so grossly negligent or the treatment so common that a layman could readily appraise it, the appellate decisions indicate that no expert testimony is necessary. (*Stogsdill v. Manor Convalescent Home, Inc.* (1976), 35 Ill. App. 3d 634, 662; *Lundahl v. Rockford Memorial Hospital Association* (1968), 93 Ill. App. 2d 461, 465; *Scardina v. Colletti* (1965), 63 Ill. App. 2d 481, 488; *Graham v. St. Luke's Hospital* (1964), 46 Ill. App. 2d 147, 158; *cf. Edgar County Bank & Trust Co. v.*

*Paris Hospital, Inc.* (1974), 57 Ill. 2d 298, concerning application of *res ipsa loquitur* in medical malpractice cases which is not at issue here.) A requirement that the standard of care be established through expert testimony except where the common knowledge of laymen is sufficient to recognize or infer negligence is broadly recognized throughout the country. See, *e.g., Pendleton v. Cilley* (1978), 118 Ariz. 84, 86, 574 P.2d 1303, 1305; *Cobbs v. Grant* (1972), 8 Cal. 3d 229, 236, 502 P.2d 1, 5, 104 Cal. Rptr. 505, 509; *Huffman v. Lindquist* (1951), 37 Cal. 2d 465, 473, 234 P.2d 34, 39-40; *Baoust v. Kraut* (Del. 1977), 377 A.2d 4, 6-7; *Karrigan v. Nazareth Convent & Academy, Inc.* (1973), 212 Kan. 44, 49-50, 510 P.2d 190, 195; *Larsen v. Yelle* (1976), 310 Minn. 521, 523, 246 N.W.2d 841, 844; *Swope v. Printz* (Mo. 1971), 468 S.W.2d 34, 39; *Kortus v. Jensen* (1976), 195 Neb. 261, 268, 237 N.W.2d 845, 850 (expert testimony is necessary); *Hammer v. Rosen* (1960), 7 N.Y.2d 376, 380, 165 N.E.2d 756, 757, 198 N.Y.S.2d 65, 67; *Morgan v. State* (1972) (mem.), 40 App. Div. 2d 891, 337 N.Y.S.2d 536, 537; *Bruni v. Tatsumi* (1976), 46 Ohio St. 2d 127, 130, 346 N.E.2d 673, 676-77; *Versteeg v. Mowery* (1967), 72 Wash. 2d 754, 755, 435 P.2d 540, 541; Annot., 81 A.L.R.2d 597 (1962).

The malpractice alleged here was Dr. Tiesenga's failure to identify the left recurrent laryngeal nerve during what the defendants testified was extremely difficult thyroid surgery involving a thyroid gland which was surrounded by scar tissue as a result of prior surgery and treatment. This is not the type of situation in which the common sense of laymen could provide the standard of care. *Cf. Comte v. O'Neil* (1970), 125 Ill. App. 2d 450, 454, listing as instances of malpractice claims actionable without expert medical testimony: sponges left in the abdomen, instruments left after surgery, and X-ray burns.

This court has recognized two exceptions to any

requirement of expert testimony to establish the standard of care in medical malpractice cases in addition to the common-knowledge or gross-negligence exception. In *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, hospital licensing regulations, accreditation standards, and bylaws, like evidence of custom, were admissible as evidence of the standard of care by which the conduct of the defendant hospital would be judged. In *Ohligschlager v. Proctor Community Hospital* (1973), 55 Ill. 2d 411, this court held that explicit instructions furnished by the manufacturer for the proper manner of intravenous injection of a drug and the warning of hazards accompanying its improper adminstration provided the proof of the proper standards which would ordinarily be shown by expert medical testimony. No similar evidence was adduced here to prove the standard of care.

A second issue decided in *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 335-36, was whether an expert witness could be cross-examined concerning recognized treatises in their field where they did not purport to base their opinions on the views of these authorities. This court determined that such cross-examination was permissible, despite the hearsay nature of the treatises, in order to insure that expert testimony will be more accurate and a more effective tool in the attainment of justice. In the instant case, counsel for both the plaintiff and the defendants exercised the right to cross-examine the experts with statements from treatises on thyroid surgery. The treatises were thus admitted as impeachment but not as substantive evidence.

Plaintiff argues, however, that the treatise used to cross-examine Dr. Tiesenga, and recognized by him as an authority, established the requisite standard of care and should be admissible as substantive evidence. Such is not the law in this jurisdiction at this time, and it is

unnecessary for us to decide now whether and under what circumstances a plaintiff may introduce medical treatises as substantive evidence; plaintiff has made no attempt to introduce the treatise used to cross-examine Dr. Tiesenga as substantive evidence. *Cf. Lawson v. G.D. Searle & Co.* (1976), 64 Ill. 2d 543, 556-58, holding that it was not improper for defendant's expert to testify that he based his opinion on clinical studies published in the literature since the law cannot ignore that medical science is a mass of transmitted and collated data.

Plaintiff here had the burden of establishing that the defendant doctors were guilty of malpractice. She failed, however, to introduce evidence of the standard of care to which the defendants were bound to adhere. Plaintiff's expert, Dr. Berger, testified only concerning his own personal preference for isolating the laryngeal nerve under the facts presented to him in the hypothetical question. He at no time testified that there was a generally accepted medical standard of care or skill which required the identification of the laryngeal nerve under the circumstances. Plaintiff's witness Dr. Kowal testified that the decision whether to isolate the nerve varied from case to case.

The appellate courts have held that the testimony of the defendant doctor may be sufficient to establish the standard of care (*Anderson v. Martzke* (1970), 131 Ill. App. 2d 61, 65; *Comte v. O'Neil* (1970), 125 Ill. App. 2d 450, 453), but it is apparent that the defendants' testimony here did not indicate a standard at variance with their actual conduct. Dr. Tiesenga testified that because of prior surgery on and treatment of plaintiff's thyroid, it would have been unwise to attempt to isolate her laryngeal nerve. The better practice, according to Dr. Tiesenga's testimony, was to skirt the area where the nerve might possibly be. Dr. Walsh concurred. When confronted with a statement from a recognized treatise that the first step in

performing a thyroidectomy is to expose and identify the recurrent laryngeal nerve, Dr. Tiesenga agreed with the statement only as a general proposition. He testified that where there has been prior surgery and treatment, it is not always good practice to follow the procedure indicated in the treatise.

In sum, the evidence presented two conflicting opinions in the medical community concerning the proper procedure to be observed under the circumstances. Absent is any statement of a standard Dr. Tiesenga was required to follow in this case.

This court has refused to affirm a directed verdict where there was positive expert testimony concerning the applicable standard of care even though the opinions were weakened on cross-examination and were contradicted by defendant's experts. The weight to be given to the expert testimony in such cases is for the trier of fact. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423-24.) However, the appellate court, when presented only with testimony of the existence of methods other than those employed by the defendant but no testimony that the method used by the defendant was not considered proper by the medical community, has affirmed directed verdicts for defendants. See *Ybarra v. Cross* (1974), 22 Ill. App. 3d 638; *Estell v. Barringer* (1972), 3 Ill. App. 3d 455.

Other jurisdictions, when presented only, as we are here, with conflicting opinions by testifying physicians of what they personally consider correct technique under the circumstances, have concluded that the plaintiff has failed to present sufficient evidence of a standard of care in the medical community to submit the case to the jury. (*Davis v. Virginian Ry. Co.* (1960), 361 U.S. 354, 4 L. Ed. 2d 366, 80 S. Ct. 387; *Cable v. Cazayou* (La. App. 1977), 351 So. 2d 797; *Swope v. Printz* (Mo. 1971), 468 S.W.2d 34; *Kortus v. Jensen* (1976), 195 Neb. 261, 237 N.W.2d 845; *Fernandez v. Baruch* (1968), 52 N.J. 127, 244 A.2d 109;

*Versteeg v. Mowery* (1967), 72 Wash. 2d 754, 435 P.2d 540; see *Cornfeldt v. Tongen* (Minn. 1977), 262 N.W.2d 684, 697.) *Bruni v. Tatsumi* (1976), 46 Ohio St. 2d 127, 346 N.E.2d 673, cited by plaintiff to support her contention that it was error to direct a verdict here, fails to support plaintiff's argument. There the medical expert testified that in the specialized medical community to which the defendant belonged, it was not considered good medical practice to use the riskier procedure the defendant employed despite the existence of more than one recognized surgical procedure to accomplish the same surgical result. Under those circumstances, the Ohio court held that a question for the jury was presented and that it was error to direct a verdict for the defendant. By contrast, no medical evidence presented here indicated that the procedure used by defendant was unacceptable in the medical community. The only evidence in favor of plaintiff was that Dr. Berger would have used a different procedure. *Mayers v. Litow* (1957), 154 Cal. App. 2d 413, 316 P.2d 351, also relied upon by plaintiff is inapposite since the decision was based upon the existence of expert testimony that a severance of the nerve should not occur.

It is insufficient for plaintiff to establish a *prima facie* case merely to present testimony of another physician that he would have acted differently from the defendant, since medicine is not an exact science. It is rather a profession which involves the exercise of individual judgment within the framework of established procedures. Differences in opinion are consistent with the exercise of due care. (See *Ybarra v. Cross* (1974), 22 Ill. App. 3d 638, 644; *Kortus v. Jensen* (1976), 195 Neb. 261, 271-72, 237 N.W.2d 845, 852.) As the Supreme Court of Washington noted in a similar case:

"[A] jury is no more capable of choosing between conflicting standards in this highly tech-

nical area than it is in creating a standard for itself. For this very reason it has always been the rule that:

The testimony of other physicians that they would have followed a different course of treatment than that followed by the defendant, or a disagreement of doctors of equal skill and learning as to what the treatment should have been, does not establish negligence. In such cases, the court must hold that there is nothing upon which the jury may pass, the reason being that the jury may not be allowed to accept one theory to the exclusion of the other. [Citations.] " *Versteeg v. Mowery* (1967), 72 Wash. 2d 754, 758-59, 435 P.2d 540, 543.

Without evidence of a standard of care to which the defendant doctors were bound to adhere there is nothing against which a jury could measure the defendants' conduct and no means for it to resolve the factual question of whether the defendants deviated from the established standard and, therefore, were negligent. In the absence of an essential of plaintiff's cause of action, even looking at the evidence in the light most favorable to plaintiff, it is clear that no verdict in her favor could ever stand. Therefore, applying the *Pedrick* standard, it was not error to direct a verdict for defendants.

For the above reasons the judgment of the appellate court is affirmed.

*Judgment affirmed.*