CYNTHIA DICKSTEIN BERGEN, Plaintiff-Appellee, *v.* JAFAR SHAH-MIRANY, M. D., *et al.*, Defendants-Appellants.

First District (5th Division) No. 78-2150

Opinion filed April 25, 1980.—Rehearing denied May 22, 1980.

William V. Johnson, of Johnson, Cusack & Bell, Ltd., of Chicago (Thomas H. Fegan, of counsel), for appellants.

James H. Canel, Ltd., and Leonard C. Arnold, Ltd., both of Chicago (James H. Canel, of counsel), for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

Defendants appeal the order of the trial court granting a new trial after a jury had returned a verdict in defendants' favor in a medical malpractice action brought by plaintiff. First, they contend that the case should never have gone to the jury because their motions for a directed verdict should have been granted since plaintiff had failed to make out a prima facie case against them. Second, they contend that even if the case were properly before the jury the trial court erred in granting a new trial based on its finding that defendants had improperly questioned certain medical witnesses. We reverse.

Plaintiff, Cynthia Dickstein Bergen, was born with certain abnormalities in her right hand. Despite these abnormalities, she could use her right hand while playing the piano, typing and working as a full-time nurse's assistant. After the performance of the medical procedure involved in this case, she could no longer use her right hand to do any of those things.

On February 18, 1972, plaintiff, who was complaining of chest and shoulder pains and exhaustion, was admitted to St. Francis Hospital by defendant Dr. Jafar Shah-Mirany, a cardiovascular thoracic surgeon. At the time of her admission to the hospital, she was taking digitalis, which is medication for heart failure or irregularity. Upon entry, a history was taken and a physical examination was performed. The results indicated that plaintiff had a rapid heart rate and a harsh murmur in the pulmonic area of the heart. On the basis of her complaints, her history, and the physical findings, she was diagnosed on admission as having congenital heart disease. Various tests were also performed on her during her stay in the hospital. A cardiac series was performed and revealed possible pulmonary stenosis (narrowing) or dilation of the pulmonary artery. Both an electrocardiogram and an echocardiogram were performed and revealed "sinus tachycardia" or fast heart rate. After most of the test results were in, Dr. Shah-Mirany asked defendant Dr. Steiner, a cardiologist, to further evaluate plaintiff.

Dr. Steiner reviewed the results of plaintiff's tests and her admitting history and physical examination. He did not necessarily agree with the electrocardiographer's finding that plaintiff had sinus tachycardia. Also, contrary to the electrocardiographer's findings, he found a positive Q wave on plaintiff's electrocardiogram which indicated to him that she might have some sort of left heart disease. He examined plaintiff on February 21 and, after his examination, made the following progress note on plaintiff's hospital chart:

"2-21-72. Problem of recent flu superimposed on mild pulmonary murmur, with chest pain and dyspnea, on effort. Differential diagnosis pulmonary stenosis mild pericarditis * * *."

Based on his examination and the various other information before him, he decided to perform cardiac catheterization studies, which are a series of invasive diagnostic tests of the cardiac function through the use of radiopaque dyes and X ray. In particular, he decided to perform a right heart catheterization, which requires the placing and passing of a catheter through a vein either in the antecubital fossa of the arm or through the femoral vein of the groin, a left heart catheterization, which requires the placing and passing of a catheter through the brachial artery in the arm of the femoral artery in the groin, and a coronary angiography, which requires injecting a radiopaque substance into an artery. Dr. Steiner chose the right heart catheterization, which constitutes a right heart study, and the left heart catheterization and coronary angiography, which constitutes a left heart study, because the information which he had on plaintiff's condition suggested right and left heart disease. Although, at trial, Steiner could not specifically recall talking to plaintiff about the catheterization

procedure prior to its performance, he did say that he always· follows a procedure in which he explains the tests and their risks, including brachial artery obstruction, to a patient before the catheterization. Although plaintiff, at trial, stated that she did not know what a catheterization was and was not aware of the risks at the time she signed a consent authorizing the tests, she did state that she voluntarily signed it and understood its meaning.

On February 22, the catheterization was performed on plaintiff's right arm because the equipment necessary for the tests was positioned such that a right arm test would be easier. Plaintiff remained in the catheterization laboratory for two hours, but it took only 5 to 10 minutes to perform the right heart study and less than an hour to perform the left heart study. Findings from the studies indicated that plaintiff had a mild pulmonary stenosis and a persistence of congenital abnormalities, but that these conditions did not require surgery.

After the catheterization, plaintiff noticed that her right arm was cold and blue and had no radial pulse. On February 23, Dr. Shah-Mirany visited plaintiff and made the following notations on plaintiff's hospital chart:

> "No pulse in right hand. Pale, some pain. Will explore the artery and restore circulation tomorrow.
>
>             ⁂
>
> Right brachial artery thrombectomy and patch graft tomorrow."

On February 24, he performed the necessary surgery and removed a little clot from the brachial artery. This surgery restored the circulation and the radial pulse. Plaintiff was subsequently released from the hospital.

Dr. Shah-Mirany next saw plaintiff about 2 or 3 weeks after her release from the hospital. At the time, he evaluated her right arm and found both its pulse and functioning power to be "okay." On February 12, 1973, he again saw plaintiff as an outpatient at St. Francis Hospital. At that time, she complained of a number of things, including pain in her shoulder, leg, and chest. He examined her for about 5 minutes. In his outpatient report for the February 12 visit he made the following notation:

> "Patient has cardiac catheterization sometime ago, and also had brachial artery repaired. Now has tenderness and some numbness and tingling in right hand. Radial pulse absent. This is circulatory insufficiency. Would like to treat medically. If no improvement noted, needs arterial repair."

He prescribed a vasodilator and multi-vitamin for plaintiff and asked her to return in two weeks.

Later in the day on February 12, plaintiff had a terrible pain in the

area of her right arm extending downward from the site of the incision and was taken to Presbyterian St. Luke's Hospital. There she was admitted as an emergency patient and she came under the care of Dr. Cornelius Bolton. Dr. Bolton, who reviewed portions of her hospital chart from St. Francis Hospital, found that plaintiff had a cold right hand with diminished radial, ulnar, and brachial pulses. He believed that the diminished pulse indicated a deficiency of blood supply caused by an obstruction and prescribed anticlotting medications. Although he believed that plaintiff had a deficiency of blood, he did not conduct any tests to determine if this deficiency was harming her. Plaintiff's arm improved only slightly. Also during the two months which she spent at the hospital, she developed psychiatric problems for which she received treatment. Upon discharge, a report, concurred in by Dr. Bolton, indicated that plaintiff had "arterial insufficiency of the right arm secondary to congenitally small arteries and catheterization studies."

On April 18, 1973, plaintiff went to see Dr. William Stromberg, an orthopedic surgeon, because of her continuing right arm pains. On examining her, he noticed that her right arm could function just as well as it could in 1967 when he had conducted an earlier examination of her. Nonetheless, he checked the area on her arm where the catheterization had been performed but could find nothing which would cause the pains in her arm. He also could not find any problem with her circulation.

At this time or shortly thereafter, Dr. Stromberg received reports from a Dr. Yao and Dr. Simon who had performed tests on plaintiff at Northwestern Hospital. Dr. Yao had performed a nerve conduction test and a blood flow analysis on plaintiff. The nerve conduction test reported normal and the blood analysis test, although indicating a brachial artery stenosis, reported that there was adequate collateral flow. On the basis of these two tests, Dr. Yao concluded that plaintiff's problems were emotional and not organic. Dr. Simon, a psychiatrist, reported that plaintiff had a positive yes/no test over the right hand and indicated that such a finding was generally seen in people who are hysterical or who are malingering.

On May 8, Dr. Stromberg had plaintiff admitted to Northwestern Hospital and on May 9, he operated on the catheterization incision site on the right arm to determine if there was anything physically wrong with the arm. He removed some scar tissue from the medial nerve but he could not find a significant compression of the nerve in the area. After this operation, plaintiff's arm felt better for a few months and then started hurting again. Ultimately, in 1974, Dr. Stromberg referred plaintiff to the Mayo Clinic. Upon conclusion of her treatment there, the following report was made by a Dr. Dobyns:

"I doubt that the risk of vascular surgery or preliminary workup

would be warranted, though some tests such as Doppler studies, temperature studies, oscillometric studies would be interesting. Historically, the patient has been unable to sustain any program of gradual increasing function or exercise and apparently seldom makes the attempt. I feel that this is the first order necessary. If this can be accomplished, or is only inhibited by symptoms which can be controlled by physical therapy modalities, this would be a preferable plan. If clot occasion seems to be interfering with such a program, stellate block and so forth might then be considered. On the other hand, if such a program is not possible, for whatever reason, the patient might do better to ignore the right upper extremity except to protect it from injury, and proceed with life activities as a one-handed person."

In the fall of 1974, Dr. Ruder had plaintiff again admitted to Northwestern Hospital for evaluation of a possible thyroid abnormality and of a pain in her right arm. After a series of tests, the thyroid was determined to be normal. The evaluation of the arm, however, proved to be inconclusive. Dr. Ruder then referred plaintiff to Dr. Edward Tuder, a psychiatrist, because she was depressed. He diagnosed plaintiff as being schizophrenic and said that plaintiff's arm troubles aggravated her condition. He believed that a compromised blood flow caused the pain but he did not have blood flow studies or nerve conduction tests performed to verify that belief. He did not believe that the pain in the arm was psychological in nature because plaintiff had nothing to gain by it. At least up until the time of trial, Dr. Tuder was still treating plaintiff.

Plaintiff brought this suit against defendants claiming injuries and consequent damages as a result of their negligence. She claimed[1] that they were negligent in one or more of the following respects:

(1) submitted her to a left heart catheterization with coronary angiography;

(2) did a left heart catheterization with coronary angiography after right heart studies were completed;

(3) failed to obtain her consent before doing the procedure;

(4) failed to apply the knowledge and use the skill and care which reasonably well qualified specialists in the same field, practicing in the same locality or similar localities, ordinarily would use in similar cases and circumstances.

At the close of plaintiff's case and again at the close of all the evidence, defendants moved for a directed verdict. The motions were denied and the case went to the jury. The jury returned a verdict for defendants but the trial court granted a new trial. This appeal followed.

---

[1] These were the bases for negligence given to the jury in the issues instruction.

OPINION

■■ Although this is an appeal from an order granting a new trial, we may properly review all rulings of the trial court, including defendants' claim that their motion for directed verdict should have been granted. (See *Turner v. Commonwealth Edison Co.* (1978), 63 Ill. App. 3d 693, 380 N.E.2d 477.) A motion for directed verdict is properly granted where when all the evidence is viewed in a light most favorable to plaintiff, it so overwhelmingly favors defendants that no verdict, other than a verdict for defendants, could stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

■ Defendants claim that their motions for directed verdict should have been granted because plaintiff had failed to present a prima facie case of medical malpractice against either of them. In order to present a prima facie case of medical malpractice, a plaintiff must offer proof, generally through expert testimony, of (1) the standard of care against which the defendant doctors are to be judged; (2) the fact that the doctors have failed to perform up to that standard; and (3) the fact that the failure to perform up to the standard has caused the injury complained of by plaintiff. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279.) Defendant Dr. Shah-Mirany claims that a directed verdict should have been granted him because plaintiff had failed to offer proof that he breached any standard of care. Defendant Dr. Steiner claims that a directed verdict should have been granted for him because plaintiff had failed to offer any proof that the catheterization studies caused plaintiff's injuries.

At trial, Doctor Harry Fozzard, plaintiff's medical expert, was asked a hypothetical question based on the facts which existed before Dr. Shah-Mirany referred plaintiff to Dr. Steiner. He testified that the person who made the referral performed within the range of acceptable medical practice. He was also asked a hypothetical question based on the facts which existed before Dr. Steiner conducted his cardiac catheterization studies on plaintiff. He testified that the person who conducted the studies did not perform within the range of acceptable medical practice by performing the left heart catheterization and the coronary angiography. He further testified that if the person conducting the studies did not tell the patient anything about the studies and risks, that person did not perform his duty. When initially asked if the failure to perform up to medical standards caused the patient's injuries, he testified that it did not. Later, however, when informed of additional facts, including the reports and finding made while plaintiff was hospitalized at Presbyterian St. Luke's Hospital, the findings made by Dr. Shah-Mirany on February 12, 1973, and the Mayo Clinic Report, he stated that he had "a larger degree of doubt" as to his initial opinion. Dr. John P. Bicoff, defendants' medical

expert, was asked a hypothetical question based on the facts which existed before Dr. Steiner conducted his studies on plaintiff. He testified that the person who conducted the studies did perform within the range of acceptable medical practice.

■ We conclude that a directed verdict should have been granted in Dr. Shah-Mirany's favor. Our review of the record does not indicate any breach of any medical standard by him. In fact, Dr. Fozzard, plaintiff's medical expert, testified in response to a hypothetical question involving the actions of Dr. Shah-Mirany that he performed his duties properly. With no evidence of this element of a medical malpractice cause of action, the standard for the granting of a directed verdict has been met. (*Montgomery v. Americana Nursing Centers, Inc.* (1976), 39 Ill. App. 3d 315, 349 N.E.2d 516.) In light of this disposition, we need not consider the basis for the granting of the new trial with respect to Dr. Shah-Mirany.

■ We conclude, however, that the trial court correctly denied a directed verdict to Dr. Steiner. Dr. Fozzard offered sufficient testimony on each of the elements to establish a prima facie case. Dr. Fozzard offered testimony of medical standards and that Dr. Steiner failed to perform up to the applicable medical standards by submitting plaintiff to a left heart catheterization and coronary angiography. He also testified that Dr. Steiner had an obligation to inform plaintiff of the catheterization procedure and its risks and that if he failed to fulfill this obligation, as was claimed by plaintiff, then he fell below acceptable medical standards in that respect too. Dr. Fozzard also provided sufficient testimony on the causation element. Initially, he stated that based on the information which he then had he did not believe that the catheterization studies harmed plaintiff. However, when later informed of other facts, including the reports and findings made regarding the plaintiff's hospitalizations and treatment after the studies were performed, he stated that he had "a larger degree of doubt" as to his initial opinion. Under the standard for granting directed verdicts, this testimony was sufficient to prevent granting a directed verdict. *Anderson v. Beers* (1979), 74 Ill. App. 3d 619, 393 N.E.2d 552.

Nevertheless, even though we conclude that the trial court ruled correctly in denying Dr. Steiner's motion for a directed verdict, we find that the trial court abused its discretion in granting a new trial. A new trial was granted on the basis of plaintiff's claim that defendants' questioning of two of plaintiff's medical witnesses, Dr. Tuder and Dr. Bolton, and their questioning of their own expert, Dr. John Bicoff, contained misstatements of fact. In particular, she refers to questions in which it was stated that the results of Dr. Yao's blood flow studies were normal. Plaintiff argues that the results of the studies were not normal. Dr. Yao's studies indicated "the flow velocity patterns, the rate of flow recorded

from the right radial and ulnar arteries are abnormal. This finding is compatible with a brachial artery stenosis" and (regarding the systolic pressure) "In correlation, both the pressure and the flow velocity are indicative of adequate collateral flow." Plaintiff argues that defendants' misstatement of these findings was prejudicial because an accurate representation of these findings was critical to proof of the causation element of her case.

We believe that it is clear that defendants' questions inaccurately represented the findings of Dr. Yao; yet, we conclude that plaintiff could not have been prejudiced by the misstatements. Crucial to our conclusion is that portion of Dr. Yao's findings which indicates that there was an adequate collateral flow of blood. That finding, as interpreted by Dr. Stromberg, meant that there was a sufficient flow of blood to plaintiff's hand. It did not mean, of course, that the blood flow was normal, but what was crucial to plaintiff's case was the sufficiency of the blood flow. If Dr. Yao's blood tests had indicated that the brachial artery stenosis had cut off the blood supply necessary to the hand, and thus form a basis for the conditions complained of by plaintiff, then a representation that the tests were normal would have harmed plaintiff's case. However, since Dr. Yao found an adequate collateral blood flow, which would eliminate a lack of blood as an explanation for the injuries, we cannot say that any misrepresentations concerning the blood tests were harmful. Since the misstatements were harmless, we believe that granting a new trial on this basis constituted an abuse of discretion. (See *Bradley v. Caterpillar Tractor Co.* (1979), 75 Ill. App. 3d 890, 394 N.E.2d 825.) Therefore, we reverse the order of the trial court and reinstate the jury verdict.

Reversed.

SULLIVAN, P. J., and MEJDA, J., concur.