(No. 83-CC-0041-)

KENNETH TIVADOR, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed November 2, 1987.*

PAUL B. EPISCOPE, for Claimant.

NEIL F. HARTIGAN, Attorney General (JAMES A. TYSON, Assistant Attorney General, of counsel), for Respondent.

Raucci, J.

## INTRODUCTION

This is a claim for damages for personal injuries sustained by Claimant on July 9, 1981, while he was riding as a passenger in the backseat of a 1973 Oldsmobile automobile. As the automobile was entering a double reverse curve, the right front wheel dropped off the roadway onto the right shoulder, and bounced through a series of potholes at the edge of the pavement, the potholes being up to six inches in depth, 16 to 17 inches in width, and six feet in length. When the car dropped off the pavement and started hitting the bumps, Claimant's head was thrown forward. When the driver brought the car back onto the pavement, Claimant's head snapped backwards, rendering him paralyzed. The driver lost control of the car, skidded through the curve, and went off the left side of the road.

## FACTS

On July 9, 1981, Claimant was 20 years old. He

worked in a factory and shared an apartment in Downers Grove, Illinois, with Michael Manion, a fellow worker. At the time of the accident he worked a shift from 4:30 p.m. to 12:15 a.m. At the end of the shift on the day in question, another fellow worker, Neal Rauch, drove Claimant and Manion to their apartment. After talking together for two or three hours, Rauch, Manion, and someone named Dave went swimming in a park district pool to which Dave had the keys. Claimant remained in the apartment. Around 5:30 a.m., the three returned to Claimant's apartment. Manion agreed to pay for breakfast and to buy gas if Rauch would use his car to take them to breakfast. Dave did not want to go, so Rauch, Manion, and Claimant left for breakfast in Rauch's car. Claimant sat in the backseat and Manion sat in the front passenger's seat.

Rauch stopped for gas at the Union 76 gas station in Bolingbrook at the intersection of State Route 53 and Frontage Road along I-55.

Rauch testified in his evidence deposition that when they pulled into the gas station Manion gave a credit card to the attendant and told him to fill up the car. After the attendant filled the tank he took the card into the station. He then motioned for Manion to come inside. Manion got out of the front passenger's seat and went into the station. He then came out of the station, got back in the car, and said to Rauch, "Let's go." Rauch assumed Manion had paid for the gas. On attempting to leave the gas station, he first drove in a direction in which the exit was blocked, but turned around and found the exit to Frontage Road. He testified that at that point he was going about 15 miles per hour, and that there had been no commotion or disturbance at the gas station.

Claimant's evidence deposition as to events at the gas station was much the same as that of Rauch. He testified that all he could remember was Mike Manion getting out of the car to pay for the gas, and getting back into the car and saying, "Let's go." He testified that there was no commotion or disturbance at the gas station.

Lawrence L. Rouceville, an employee at the gas station and a witness for Respondent, gave a different version of events at the station. He testified that the car came up to the self service island and that a man six feet tall with shoulder-length blond hair filled up the car. He got a credit card from somebody in the car and gave it to the witness. The witness took the card into the gas station where another employee wrote up credit card purchases and checked to see if the card was stolen. A check revealed that the card was stolen. The employee in the station told the witness to detain the car. The witness went back out and told the man who gave him the card that the card was being checked.

"I came outside, and he said, 'Well, I can pay for it in cash. Can I have the card back?' He was real nervous.

I said, 'Well, you know, it will take just a little longer. Can you wait?' He said, 'Okay. I will go back to the car and get the money. Could you give me back the card?'

'Well,' I said, 'whatever.' So, he got in the car. As soon as they got in the car, they spun out and took off towards the parking lot."

The exit towards which they were driving was blocked, so the driver turned around, "* * * came back and went on to Frontage Road really fast." The witness watched the car travelling east on Frontage Road for 200 to 250 yards. In his opinion the car was going 40 miles per hour when it left the gas station and failed to stop at the stop sign for Frontage Road, and was going 65 to 70 miles per hour when he last saw it.

On cross-examination the witness testified that

when the man who gave him the credit card got back into the car he got into the right front passenger's seat. He also stated that he had no dealings with the passenger in the back seat (Claimant), nor the driver (Rauch), but only the blond-haired passenger who was six feet tall (Manion).

Continuing chronologically, we return to the testimony of Rauch. Rauch testified that as he drove east on Frontage Road he came to an S-curve. He had been traveling around 45 to 50 miles per hour. He saw the curve and slowed down immediately.

"A. Well I saw the curve coming up ahead, so I slowed down immediately."

As he entered the curve he was going approximately 30 to 35 miles an hour.

"Q. Before you got into the curve, can you estimate for us how fast you were going?

A. When I was going into the curve?

Q. Just as you got to the curve, just before you started to turn.

A. I would say approximately 30, 35 miles an hour."

According to Rauch's testimony he was therefore travelling at the speed of the warning sign posted shortly before the entrance to the curve specifying a speed of 30 miles per hour, although he testified that he did not remember seeing this sign the morning of the accident.

Going into the curve his right front wheel dropped off the pavement to a depth of about six inches. None of the other wheels went off the road. He tried to get back onto the road. When he got back onto the road he applied his brakes, skidded and went into a culvert on the opposite side of the road. The car ultimately hit a barbed wire fence.

He and Manion got out of the car but Claimant could not move. A small car drove up and Manion and the driver of the car put Claimant in the car and took

him to the hospital. About 10 to 15 minutes later a police car arrived and the officers handcuffed Rauch.

After the accident, but before the police arrived, Manion told Rauch he had used a bad credit card.

After the accident, the right front tire was flat.

In his evidence deposition Rauch attributed his right front wheel going off the road to the curve being sharp. Also, he stated, "I was a little confused on which way to go."

On cross-examination he testified that he was going 50 miles an hour on Frontage Road, he thought that was the speed limit, the road was flat, curvy, visibility good, and the pavement dry. He testified that the scene of the accident was about a mile or mile-and-a-half from the gas station.

On direct examination he had testified: "Well, I saw the curve coming up ahead, so I slowed down immediately."

Under the State's cross-examination, he modified this statement by saying that he did not see the curve until he was past the curve sign, and he marked a tree on Claimant's photograph 4 showing where he first noticed the curve. He reiterated that going into the curve his speed was 30 to 35 miles per hour, but admitted that in a recorded telephone statement he had said that he was doing 50 miles per hour when entering the curve. He stated that he did not see the double reverse curve sign with its advisory speed limit, but had no trouble seeing the roadway as he approached the curve, the sun was not in his eyes, and he had no trouble seeing the outer edge of the pavement. He was charged and handcuffed for taking the gas. He pleaded guilty to improper lane usage and proof was made that he was convicted in the

circuit court of Will County, Illinois, on theft of gasoline. During the course of the trial, Claimant moved to strike the portions of the evidence deposition pertaining to Rauch's ticketing for improper lane usage and conviction for theft of gasoline. By order dated September 19, 1984, our Commissioner ruled that cross-examination of the witness as to whether he had been given a traffic ticket at the scene of the accident was proper because the witness admitted he had pleaded guilty. Our Commissioner further ruled that proof of conviction of theft of gasoline was admissible because the offense involved dishonesty.

On re-direct examination the witness explained that as he approached the curve he was going 50, but when he entered it he was going 30 to 35.

In his deposition, Claimant testified that as they were driving east on Frontage Road he had no impression or feeling that it was being driven at an exceptionally high rate of speed. Rauch seemed to be in control of the vehicle. They came to a curve, and as they went into the curve, "the right front end of the car dropped down off the side of the road." No part of the rear of the car appeared to drop down. The car started to bounce around. The driver struggled with the car, brought it back up onto the road, and the car then went all the way across the highway into a ditch.

The witness described the breaking of his neck as follows:

"Q. What happened to you in the back seat, if anything, when the—when you felt this bouncing in the right front?

A. I was thrown forward, and then when we got back on the road, I was thrown back, and I felt my neck snap, and that's when I felt the bad pain through the back of my head and I was left without moving anything after the car was stopped.

Q. Did you lose consciousness?

A. No.

Q. At what point did you feel yourself thrown forward?

A. Right about when we started hitting the bumps, I was thrown forward.

Q. And at what point were you thrown backwards?

A. When we started swinging back on to the road.

Q. At what point did you feel the pain in your neck that you described earlier?

A. Right about that time.

Q. When you went backwards?

A. Yes.

Q. Can you describe the pain that you felt in your neck?

A. It was just a sharp, shooting, burning pain.

Q. Did you feel pain anywhere else.

A. No.

Q. Were you thrown out of the car at all?

A. No.

Q. Did you strike your head on any part of the car?

A. The driver's door.

Q. Which part of your head did you strike?

A. Probably the back of my head.

Q. Was that—when did you strike that?

A. When the car stopped.

Q. And was that before or after you'd felt your neck snap?

A. It was after.

Q. When the car finally stopped, where was it?

A. It was in a ditch across the highway."

When the car came to rest, Claimant could move his head and talk, but other than that he was totally paralyzed.

## ISSUES

## I. WAS THE STATE OF ILLINOIS NEGLIGENT?

Claimant's allegations of the State's negligence fell into three broad categories: failure to sign the road properly, failure to maintain it properly, and failure to warn of the low shoulder.

## Failure to Sign the Road Properly

Robert L. Lippman, a civil engineer, testified as an expert on behalf of Claimant that because the speed limit on Frontage Road was 55 miles per hour, in addition to the reverse curve sign with the 30-miles-per-hour advisory, located 375 feet away from the point of curvature, there should have been placed 600 or 700 feet in advance of the point of curvature another sign stating "curve ahead." In addition, chevrons should have been located along the outside of the curve to delineate the curve. In other words, there was not sufficient advance warning of the curve and no positive guidance through the curve. He regarded the chevrons as particularly necessary because in addition to the curve the roadway presented to the driver an entrance to a weigh station and an exit from the weigh station.

We do not consider the signing of the road an issue because Claimant's occurrence witness, the driver of the car, testified clearly that even though he did not see the warning sign he saw the curve and entered it at a speed of 30 to 35 miles per hour. On cross-examination he testified that he had no trouble seeing the roadway as he approached the curve, that he had no trouble determining where the edge line of the outer lane was, that visibility was good, and that the sun was not in his eyes. Thus, the failure to have two warning signs instead of one, and the absence of delineating chevrons, were not factors in causing the witness to drive onto the shoulder. He did testify that the curve was sharp and that he "was a little confused on which way to go," but this does not amount to proving by the preponderance of the evidence that the State was negligent in its signing, or that such negligence was a proximate cause of the accident.

Claimant is bound by the testimony of his witnesses and the case he presents. There is no testimony by Claimant personally or by his witness Rauch that Rauch failed to see the curve and entered it at too fast a speed, thereby making the absence of signs and chevrons relevant. On the contrary, Rauch testified that he saw the curve and slowed down immediately.

"Well, I saw the curve coming up ahead, so I slowed down immediately."

On re-direct examination he took pains to explain that on approaching the curve he was going 50 miles per hour (five miles under the speed limit), and that on entering it he was only going 30 to 35. His definition of "approaching" and "entering" is worthy of reproduction in full:

"Q. What were you trying to say, but with reference to when you were going 50 miles per hour and when you had slowed?

A. Approaching the curve, coming out of the Union 76 Gas Station on the way on Frontage Road, that is approaching the curve. Entering the curve is when I am coming to the curve, when I saw the curve, when I saw how sharp it was, and when I had a good view of it, that is entering the curve.

Q. So, as you were approaching the curve, how fast were you going?

A. Approaching it, I was 50.

Q. But entering the curve, that is when you had slowed?

A. Right.

Q. But entering the curve, that is when you had slowed?

A. Right.

Q. To, I think you said, 30 to 35?

A. Right."

He tells us that he saw the curve, that he saw how sharp it was, that he had a good view of it, and that he slowed down to 30 to 35 miles per hour. He did not need two warning signs and chevrons.

Failure to Maintain the Road Properly

The negligence of the State, clearly shown by the

photographs introduced into evidence, and established in the testimony of the civil engineer, Lippman, and that of Lawrence T. Jahn, was in permitting a six-inch drop-off between the edge of the road and the shoulder.

Exhibits 16, 17 and 18 graphically show the dangerous nature of the drop-off.

The Claimant's expert testified in part as follows:

"Q. From your observation of the ruts as depicted. in photograph number six, and those which are measured in photographs 16, 17 and 18, do you have an opinion as to whether this condition presented a hazard to motorists on this Frontage Road?

A. Yes, it did.

Q. What is your opinion?

A. The drop off was too sudden, too deep, and too many of them to safely drive with the advisory speed limit of 35 miles per hour or faster.

Q. What is the purpose of the shoulder on a road of this kind in an area of a curve?

A. Shoulder is to support the edge of the pavement, provide a place for disabled motorists to get off the road, provide partial safety release for motorists leaving the road, and intending to come back, provides a place to park, provides a temporary detour when maintenance is being done on the road.

Q. Is there any safety elements to shoulders on a curve of this kind?

A. Safety elements should it match the pavement?

Q. Yes.

A. Yes, it should match the pavement.

Q. Why should it match the pavement?

A. So, you won't cut a tire, trap a car or make it easier to get off the pavement.

Q. In your opinion, do you have an opinion as to whether a drop off of this kind on a concrete roadway is capable of causing tire damage to a motor vehicle?

A. Yes, it is.

Q. In what way?

A. If—you can cut the tire, and you can cause it to deflate by bending the rim, bouncing action from pothole to pothole can cause a lot, breaking a shock, cause damage to vehicles."

He testified that a six-inch drop-off was hazardous, that it could cause damage to the tires and the vehicle

and cause the driver to lose control. The ruts along the edge of the pavement, in addition to being up to six inches deep, were 16 to 17 inches wide, and over six feet long.

He estimated that the shoulder had not been repaired since the spring of that year or the year before, and that the ruts, themselves, had been there at least since the spring of that year or the year before. He stated that it took a long time for traffic to make such big holes. He testified that the drop-off was extrahazardous, more so than anyone would expect. This testimony plus that of the Department of Transportation foreman established the element of notice.

Under cross-examination by the Attorney General, Mr. Lippman testified that according to Illinois standards, "the shoulder matches a pavement and slopes out at a half inch per foot from the road."
"A. It has to be stabilized and level to the road."

He further testified that the ruts in question took at least six months to form, possibly longer.

He testified that he would not want to drive through the curve at any speed in excess of 35 miles per hour and that if Rauch had been travelling in excess of 60 miles per hour he would have gone off on the right hand side of the road.
"the fact that he kept on the road except for one tire means that he just barely missed it ° ° ° So, he was going slow at the time."

Lawrence Jahn, a maintenance foreman for the Illinois Department of Transportation, whose maintenance area covered the road in the vicinity of the accident, testified that it was a regular occurrence for the shoulder to be in the condition shown in Claimant's photographs. Semitrailers parking on the shoulder or

otherwise using the shoulder to enter or exit the weigh station tore it up regularly. He testified that gravel was used to fill the ruts, but he could not remember when bituminous material was last used.

### Failure to Warn of the Low Shoulder

The State had ample notice that semi-trucks going off the road pushed the gravel away from the edge of the road on an on-going basis. The State was negligent in not putting up barricades when the situation so demanded, or at least in not putting up signs warning drivers of the low shoulder.

## II. WAS THE NEGLIGENCE OF THE STATE A PROXIMATE CAUSE OF CLAIMANT'S INJURIES?

For the negligence of the State in failing to properly maintain Frontage Road (or in failing to warn of the low shoulder) to be a proximate cause of Claimant's injuries, such negligence need not be the only cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination, causes the injury.

The failure of Rauch to negotiate the curve was a proximate cause of Claimant's injuries. But when Rauch went off the road, if the shoulder had not been in such a severe condition of disrepair, Claimant would not have suffered the particular injuries he did. If the shoulder had been level with the highway he might have been injured, or he might not have been injured at all. But as a proximate result of the six-inch drop-off, his head was thrust forward, and then thrust backward, resulting in his paralysis. Thus, it can be said that the drop-off was at least one proximate cause of Claimant's injuries.

*Peterson v. State* (1984), 37 Ill. Ct. Cl. 104, is a case in this Court involving a drop-off of three to six inches.

The driver of the vehicle, Claimant's deceased, was guilty of contributory negligence, but the Court held:

"Given the fact that the events surrounding the accident are consistent with the phenomenon known as tire nibbling, and given the testimony that indicated that there was a three to six inch drop-off along the shoulder, we believe that more likely than not the accident was at least in part proximately caused by the fact that decedent tried to bring his car back onto the road at a point which had a drop-off contrary to recognized safety standards. It is further undisputed that there were no signs warning the decedent of the dangerous condition."

The State's negligence was a proximate cause of Claimant's injuries.

## III. WAS CLAIMANT CONTRIBUTORILY NEGLIGENT?

Claimant was a passenger in the back seat and was in no way guilty of contributory negligence. There was no proof that he was engaged in some kind of joint enterprise, criminal or otherwise, with Rauch and Manion so that he could be charged with Rauch's driving. Regardless of whether Rauch gave the credit card to Manion to give to the attendant, or whether Manion had the credit card in the first place, there are no facts in the record (contrary to Respondent's allegations in its brief) that "claimant was a party to an attempt to steal gasoline through the use of a stolen credit card." Wherever the guilt might lie between Rauch and Manion with respect to the use of the stolen credit card, there is no evidence that Claimant had anything to do with the matter. Respondent presents the picture of Rauch fleeing from the scene of a crime at a high rate of speed to make it appear that Rauch's driving was the sole proximate cause of the accident. But, as discussed before, Claimant would not have sustained the specific injuries he suffered had the car not dropped into ruts six inches lower than the edge of the pavement, thereby

snapping Claimant's neck, and the expert testimony indicates that the speed of the car was "slow at the time."

## IV. MEASURE OF DAMAGES

Claimant's injuries, as appear on the face of the record, would give rise to an award of damages far in excess of $100,000.00. Subtracting the sum of $15,000.00 which he received as a consequence of a circuit court suit against Rauch, Claimant is still left with more than $100,000.00 in damages. We are required, however, to deduct the $15,000.00 from the $100,000.00 maximum award.

## V. COMMISSIONER'S RULINGS

Permitting Respondent to offer proof of Rauch pleading guilty to improper lane usage and being convicted of theft of gasoline. The evidence was properly admitted since it intended to impeach Rauch's testimony and related to his honesty.

Refusal to admit into evidence Claimant's exhibit 25. During the course of the direct examination of Claimant's expert, Claimant sought to introduce into evidence as his exhibit 25, a treatise entitled *A User's Guide to Positive Guidance* (2d edition), sponsored by the U.S. Department of Transportation Federal Highway Administration. Claimant offered this document in support of the testimony given by the witness as to the need for chevrons to delineate the curve.

The Commissioner refused to admit the document into evidence, on the grounds that it was hearsay:

"#65.40. Treatises, Scientific Works, etc. A scientific treatise, whether it be on medicine or any other subject, is hearsay and is inadmissible as proof of the statements it contains. *Walski v. Tisenga* (1978) 72 Ill. 2d 249, 21 Ill. Dec. 201, 381 N.E.2d 279. Under some circumstances it may be used to cross-examine an expert witness. SEE 39.5. Also, it may contain tables and similar

information that is admissible under a separate exception to the hearsay rule. See #66.18. It may also contain information that may be judicially noticed." *Trial Handbook for Lawyers*, Fifth Edition, Robert S. Hunter, at pages 907, 908.

The Commissioner properly refused to admit the exhibit.

Refusal to admit into evidence Claimant's exhibit 26. During the course of his cross-examination of Joseph J. Kostur, district safety and claims manager for District 1 of the Division of Highways of the Department of Transportation, Claimant sought to introduce into evidence Claimant's exhibit 26. This is a treatise published by the U.S. Department of Transportation entitled *Maintenance and Highway Safety Handbook*. The hearsay objection applies.

Refusal to admit into evidence Claimant's exhibit 27. During the course of his cross-examination of witness Kostur, Claimant sought to introduce into evidence portions of the *Standard Specifications for Road and Bridge Construction*. The Commissioner rejected it for the reason that it applied to road construction and not to road maintenance. In light of our holding on the merits, this issue need not be considered.

It is ordered, adjudged and decreed that Claimant is awarded $85,000.00 in full and complete satisfaction of this claim.