2019 IL App (1st) 181074

FIRST DIVISION
June 10, 2019

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-18-1074

| | | |
|---|---|---|
| FERID OKIC, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | Appeal from the |
| | ) | Circuit Court of |
| v. | ) | Cook County. |
| | ) | |
| FULLERTON SURGERY CENTER, LTD., and | ) | |
| ATHANASIOS DINIOTIS, M.D., a/k/a Thomas Diniotis, | ) | No. 14 L 008168 |
| Individually and as an Agent of Fullerton Surgery Center, | ) | |
| Ltd., | ) | |
| | ) | Honorable |
| Defendants | ) | Ronald J. Bartkowicz, |
| | ) | Judge Presiding. |
| (Athanasios Diniotis, M.D., a/k/a Thomas Diniotis, | ) | |
| Defendant-Appellee). | ) | |
| | ) | |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Pierce and Griffin concurred in the judgment and opinion.

## OPINION

¶ 1     Plaintiff Ferid Okic's common bile duct was damaged during a routine gallbladder removal surgery. This injury went undiagnosed for over a month, requiring corrective surgery and significantly delaying Mr. Okic's recovery. Mr. Okic sued his surgeon, Dr. Athanasios Diniotis, alleging both that he negligently performed the surgery and that he was negligent in providing postoperative care. Mr. Okic did not, however, retain an expert qualified to testify regarding the applicable standard of care for performing gallbladder removal surgery.

¶ 2      Just before the trial began, the trial court granted several of Dr. Diniotis's motions *in limine*, including ones barring Mr. Okic from presenting any evidence related to the performance of the surgery because of the absence of expert testimony on this issue. The jury found against Mr. Okic and in favor of Dr. Diniotis on Mr. Okic's remaining theory of negligence.

¶ 3      On appeal, Mr. Okic challenges the trial court's *in limine* rulings barring him from presenting evidence related to the surgery itself and evidence that he contends would also have supported his claim of postoperative negligence. Mr. Okic also argues that the court should have granted his motion for a judgment in his favor or, in the alternative, for a new trial on his claim of postoperative negligence.

¶ 4      For the reasons that follow, we conclude that the trial court's ruling precluding Mr. Okic from presenting any claim that Dr. Diniotis negligently performed the gallbladder removal was equivalent to the granting of an untimely dispositive motion. It was improper for Dr. Diniotis to present or for the trial court to entertain such a motion under the guise of a motion *in limine*. Because it is clear from the record, however, that Mr. Okic could not have presented evidence to support a claim of surgical negligence, we find no reversible error.

¶ 5      We further conclude that the trial court did not abuse its discretion in its other *in limine* rulings and that the jury's verdict in favor of Dr. Diniotis on his remaining claim of negligent postsurgical care was supported by the evidence. Mr. Okic's other arguments, which relate exclusively to damages, need not be addressed since there was no finding of liability.

¶ 6                                    I. BACKGROUND

¶ 7      Mr. Okic was diagnosed with gallstones in May 2012 and consulted with Dr. Diniotis in early August of that year regarding the need for an outpatient laparoscopic cholecystectomy

(gallbladder removal surgery). Dr. Diniotis performed the surgery on August 18, 2012, and continued to monitor Mr. Okic over the next month. By September 22, 2012, Mr. Okic was jaundiced and bile was still collecting in a Jackson-Pratt drain left at the incision site rather than flowing, as it should have, directly through the common bile duct to his small intestine.

¶ 8    Mr. Okic was admitted to Our Lady of Resurrection Hospital (Resurrection) for a series of diagnostic tests, which revealed that his common bile duct had been severed. He was then transferred to Rush University Medical Center (Rush) on September 27, 2012, for further assessment. Mr. Okic was discharged on October 3, 2012, and returned to Rush on November 16, 2012, for corrective surgery and follow-up care by Dr. Edie Chan. He was finally cleared to return to work at the end of January 2013.

¶ 9    On August 5, 2014, Mr. Okic sued Dr. Diniotis and Fullerton Surgery Center, Ltd. (Fullerton), where his cholecystectomy was performed, for negligence and negligent infliction of emotional distress. Fullerton settled the claims against it and is not a party to this appeal, but the claims against Dr. Diniotis proceeded to trial.

¶ 10                              A. Motions *in Limine*

¶ 11    One week before trial, the trial court granted a number of Dr. Diniotis's motions *in limine* to bar certain testimony and evidence. Several of these are at issue on this appeal.

¶ 12    Motions *in limine* Nos. 24 and 25 sought to bar Mr. Okic from offering any evidence that the injury to his common bile duct was the result of surgical negligence or "mistake" on the part of Dr. Diniotis. In support of these motions, Dr. Diniotis argued that a breach of the surgical standard of care could only be established through the testimony of a qualified medical expert. At argument, Mr. Okic's counsel agreed that his expert witness, Dr. Carl Blond, would offer no opinion regarding the applicable surgical standard of care. Mr. Okic's counsel argued that such

testimony was unnecessary, both because a lay person would know that a surgeon should not cut the common bile duct during a gallbladder removal and because Mr. Okic could rely instead on what his counsel characterized as an "admission" by Dr. Diniotis. The trial court disagreed and granted the motions.

¶ 13    Motions *in limine* Nos. 21 and 27 sought to bar Mr. Okic from offering any evidence of Dr. Diniotis's "domestic circumstances," including any evidence tending to show that Dr. Diniotis was distracted by the fact that, in the month or two before Mr. Okic's surgery, he learned that his son had brain cancer. At her deposition, Mr. Okic's sister-in-law, Elvira Okic, testified that she had a conversation with Dr. Diniotis sometime after the surgery in which, according to the motion, "he allegedly told her that he had made a mistake during the August 18, 2012, cholecystectomy and that he should [not] have been performing the procedure because his son had recently been diagnosed with a brain tumor." At his own deposition, Dr. Diniotis acknowledged the timing of his son's diagnosis, as well as the fact that his son passed away approximately a year and a half later, but denied making any statements to Ms. Okic regarding the effect, if any, of that situation on his performance as a doctor or surgeon.

¶ 14    The trial court granted these motions too, reasoning that evidence concerning Dr. Diniotis's state of mind during surgery was not relevant because Mr. Okic had failed in the first place to establish either the relevant surgical standard of care or a breach of that standard. The court rejected Mr. Okic's argument that evidence of the doctor's conversation with Ms. Okic was still relevant to show that he was distracted during the postoperative period. The court noted that Mr. Okic and his family were free to testify about any inattention or failure on Dr. Diniotis's part to promptly respond to their complaints but concluded that, absent any connection between his son's diagnosis and Dr. Diniotis's postoperative conduct, introducing such evidence to show that

the doctor's performance suffered as a result of events in his personal life was speculative.

¶ 15    Finally, the court granted motions *in limine* Nos. 26, 28, and 29, all relating to damages, in which Dr. Diniotis sought to bar evidence of damages not related to Mr. Okic's postsurgical care and testimony by an economist regarding the value of his future lost wages, on the grounds that no medical testimony established that his injuries were permanent or ongoing.

¶ 16                                    B. Trial Testimony

¶ 17    A four-day trial was held in November 2017. The jury heard testimony from Mr. Okic and members of his family, from Dr. Diniotis and Dr. Chan, and from competing expert witnesses regarding the relevant postoperative standard of care. Mr. Okic's medical records, including notes made by Dr. Diniotis and records kept by Fullerton, Resurrection, and Rush, were also entered into evidence, though they were not included in the record on appeal.

¶ 18                                    1. Dr. Diniotis

¶ 19    Mr. Okic first called Dr. Diniotis as an adverse witness. Dr. Diniotis testified that he went to medical school in Greece and moved to the United States in 1977. At the time of trial he had worked as a surgeon in Chicago for over 30 years. Dr. Diniotis agreed that his practice was a "one-man operation" and "very busy." He was the only doctor in the practice, and his wife was his office manager.

¶ 20    Dr. Diniotis acknowledged that there was a language barrier between him and Mr. Okic, a Bosnian refugee whose English is limited, but noted that Mr. Okic was always accompanied by his brother, sister, or another family member, who Dr. Diniotis said spoke English "far better than [Mr. Okic]."

¶ 21    After a period of observation following his cholecystectomy, Mr. Okic was released to the care of his brother, Velid Okic, with instructions to keep the dressing on and to empty the

Jackson-Pratt drain, left in his body to collect fluids, every four hours. Mr. Okic was given a note telling his employer he could not return to work until August 24, 2012. Dr. Diniotis explained that with a laparoscopic cholecystectomy, "the holes are very small, and people go back to work quickly." He expected Mr. Okic to be fully functioning within six days of his surgery.

¶ 22    Dr. Diniotis saw Mr. Okic a total of seven times in the month following the surgery. Although Dr. Diniotis made no indication of an ongoing treatment plan for Mr. Okic in his notes, he testified that he "was watching [Mr. Okic] very closely," and "was really focused on the [Jackson-Pratt] drainage." Dr. Diniotis saw no reason to weigh Mr. Okic or take his blood pressure following the surgery. He explained that his customary practice is to ask postoperative patients about their temperature, food intake, and whether they are experiencing pain, and to only document "the abnormal things." If everything is fine with a patient, the doctor writes nothing down in his notes.

¶ 23    A postoperative telephone assessment done by Fullerton staff on August 22 indicated that, four days after his surgery, Mr. Okic was experiencing mild nausea but no vomiting. At that time he reported bile drainage of 50 to 60 milliliters every four hours. Dr. Diniotis described this as "a little excessive but still expected." He did not do anything in response to this information because there was, in his opinion, no need to.

¶ 24    On September 8, Dr. Diniotis noted that there was still bilious drainage, but that it was "much less now," and on September 15 he noted that there had been no drainage for two days. He explained that this was good. But his notes from September 20 indicated that bile had begun to drain again after the third day. None of these postoperative notes included any mention of pain or any other complaints.

¶ 25    Dr. Diniotis said he was surprised when, on September 22, Mr. Okic appeared jaundiced,

and he admitted him to the hospital right away. He explained that jaundice was a sign that there was "some kind of obstruction *** in the common [bile] duct." Dr. Diniotis agreed that his notation for this visit was the first one in which he mentioned any issue or complication with respect to Mr. Okic's recovery.

¶ 26    Dr. Diniotis testified that he did not recall being shown a drainage log by Mr. Okic or his family members. He insisted that, if the drainage had been excessive, he would have written that down, "[s]o obviously that was not the case." He agreed, however, that except for two to three days around September 15, Mr. Okic experienced a bile leak for the entire month of September. He insisted that there was no reason to do anything about this because Mr. Okic had no significant complaints, "like pain, jaundice or peritonitis [inflammation]."

¶ 27    Dr. Diniotis agreed that Mr. Okic followed all of his instructions and never missed a follow-up appointment. Although he also agreed that white stool and jaundice are indications of a bile leak, he denied that Mr. Okic or his relatives told him as early as September 8 that Mr. Okic was experiencing white stool. According to Dr. Diniotis, there was no indication on either September 8 or September 15 that Mr. Okic had a damaged common bile duct.

¶ 28    Plaintiff's counsel attempted to question Dr. Diniotis about Dr. Chan's subsequent conclusion that Mr. Okic's common bile duct had been severed during the cholecystectomy performed by Dr. Diniotis. But, as the following exchange demonstrates, the court's pretrial rulings put an end to this line of questioning:

> "Q. It says 'Transected bile duct.' Do you see that?
>
> A. I see that.
>
> Q. What does that mean, sir, in your experience?
>
> A. It means that the common [bile] duct had been transected.

Q. Meaning cut?

A. Cut.

Q. Did anyone else have their instruments and tools on August 18th, 2012 at the Fullerton Surgery Center on Mr. Okic other than yourself?

MR. NICKELS [(COUNSEL FOR DR. DINIOTIS)]: Objection, Your Honor, relevance, prior Court order.

THE COURT: I agree. We are going back to what I suggested or instructed to the jury. We are not going to focus in on the surgery except that it happened.

Q. So you don't disagree with this pre and postoperative assessment, do you?

MR. NICKELS: Objection, Your Honor. Asked and answered.

THE COURT: Move on."

¶ 29    Similarly, although the jury heard from Dr. Diniotis that cutting or injuring the common bile duct is not something a surgeon would intentionally do during gallbladder removal surgery, the trial court prevented Mr. Okic's counsel from specifically questioning Dr. Diniotis regarding the surgical standard of care:

"[COUNSEL FOR MR. OKIC:] And when you went to operate on Mr. Okic, your intent was to remove the gallbladder, correct?

[DR. DINIOTIS:] That's correct.

Q. Your intent was not to do anything with the common bile duct, correct?

A. That's correct.

Q. And, in fact, the standard of care is that that is to be separated, identified and avoided?

MR. NICKELS: Objection, Your Honor.

THE COURT: We are not going to discuss this.

MR. PERAICA [(COUNSEL FOR MR. OKIC)]: I am just setting the background, Judge.

THE COURT: No, no, no. We are not going to discuss the procedure. We are going to focus on the fact that there was a complication and that it required postoperative care which you are saying was inadequate.

This is a given. We have [been] given the fact there was a complication. ***

MR. PERAICA: Judge, I am just trying to illustrate for the jury—

THE COURT: We have gone over this. *** Please move on."

¶ 30 The fact that bile was again present in Mr. Okic's Jackson-Pratt drain after a few days with no drainage did not immediately suggest to Dr. Diniotis that there was a common bile duct injury. He explained that pressure generated by the final stages of the healing process will sometimes force out more drainage. In Dr. Diniotis's opinion, the injury to Mr. Okic's common bile duct was "just one of the complications that [can] happen during surgery," and he "did exactly what the standard of care requires" of a reasonably careful general surgeon providing postoperative care.

¶ 31                                   2. Ferid Okic

¶ 32 Mr. Okic gave his own account, through an interpreter, of the postoperative care he received from Dr. Diniotis. Mr. Okic recalled that he "could not eat" and "lost [a] substantial amount of weight" during the period of time between his surgery on August 18 and his hospitalization on September 22. He explained that he was "feeling very weak" and that, for [t]he whole month of August [he] was basically lying down" and "lack[ed] energy to move or to do anything."

¶ 33 Mr. Okic could not remember exactly when he became jaundiced but recalled that his family noticed it before he did. When prompted to say whether it might have been 20, 22, or 23 days after his surgery, he simply stated "I do not recall."

¶ 34 According to Mr. Okic, Dr. Diniotis only asked about his stool on two occasions, on September 22, 2012, when Mr. Okic was admitted to the hospital, and one other time, with Mr. Okic's sister-in-law translating for him. He recounted those occasions as follows:

"A. Yes, on September 22nd. That is correct. And that I know. But before that he did not ask. Only one other time he asked. And that was when I was there with my sister-in-law. He did ask what kind of stool I am having and she told him, she translated for him, but then he did not do anything about that.

Q. And on September 22 Dr. Diniotis instructed you to go to the hospital?

A. Actually that day he said that I should go to the hospital on Monday. He told that to his nurse or his secretary. And then she turned around and then she said to doctor he is not looking good. He can die before Monday so he should be admitted right away."

¶ 35                                     3. Elvira Okic

¶ 36 Just before Mr. Okic's sister-in-law Elvira Okic took the stand, the trial judge reaffirmed his ruling barring testimony relating to a conversation she purportedly had with Dr. Diniotis, in which he told her that he was under a lot of stress regarding his son's cancer diagnosis and should not have performed Mr. Okic's surgery that day. Plaintiff's counsel moved orally for the testimony regarding that conversation to be admitted, not to establish the doctor's mental state, but to show that he admitted to Ms. Okic that he made a mistake during the surgery. The trial court denied the request, saying "If he said I made a mistake in my postoperative procedure, that would be different but not in regard to the surgery, no." Defense counsel agreed that plaintiff's

counsel should ask Ms. Okic leading questions on direct examination, to ensure that she did not refer to the conversation about Dr. Diniotis's son.

¶ 37 Ms. Okic told the jury that she observed Mr. Okic both before and after his surgery, and that "[a]fter he had surgery he looked worse than before," he was weak, in pain, and "just not himself." Ms. Okic took Mr. Okic to an appointment with Dr. Diniotis on September 8, 2012—20 days after his surgery—and served as his translator on that occasion because her English was better than his. Ms. Okic testified that at this appointment, which lasted approximately 15 minutes, Mr. Okic told Dr. Diniotis, through her, that in the days leading up to September 8 his stool was white, that he was in a lot of pain, and that he was worried because he was having a large volume of bile drainage. Ms. Okic said that the doctor's response "was kind of dismissive" and "[h]e kind of indicated that that's normal." Ms. Okic was sure that she informed Dr. Diniotis then of the condition of Mr. Okic's stool. At that same visit Dr. Diniotis or his staff also emptied Mr. Okic's drain and changed the dressing. Ms. Okic noticed a lot of brownish fluid in the bag. According to her, Dr. Diniotis reassured her that it was "a lot of drainage but it's okay."

¶ 38 The second time Ms. Okic was present when Dr. Diniotis examined Mr. Okic was on September 22, when Mr. Okic was admitted to the hospital. She described for the jury how Mr. Okic's condition had deteriorated between the two visits: "He was weaker. He was [in] more pain. His skin was pale, yellowish. He had [a] fever. He was really feeling bad."

¶ 39 Ms. Okic said she had seen the drainage log that Mr. Okic's sister Elvida Livadic kept for him and observed that it was "extremely detailed," with "dates, times, and the amount of drainage." Ms. Okic did not ever personally show this log to Dr. Diniotis, but she believed it was shown or communicated to him.

¶ 40 On cross-examination, Ms. Okic acknowledged that she did not independently remember

the date of the September 8 visit, explaining "[l]ater on we realized," it was that day, based on the dates that Mr. Okic's brother, who normally took him to his appointments, had been on vacation. Ms. Okic also recalled that the visit was about two weeks before Mr. Okic was admitted to the hospital, which corresponded with the September 8 date. Ms. Okic did not believe that there ever was a time, between his surgery and his admission to the hospital on September 22, when Mr. Okic's drainage decreased or stopped.

¶ 41                                    4. Elvida Livadic

¶ 42    Mr. Okic's sister, Ms. Livadic, testified that Mr. Okic lives in the same building as her, she sees him every day, and in the weeks following his gallbladder removal surgery, she served as his caretaker. Ms. Livadic always recorded the date, time, and amount of fluid that she emptied from Mr. Okic's Jackson-Pratt drain on a log, recalling that it was sometimes as much as 40 to 60 milliliters. Around the middle of September, she gave that log to Mr. Okic to give to Dr. Diniotis. She also advised Mr. Okic, when he first told her his stool was white "that he must tell the doctor and ask if that [was] normal." She believed this was in the beginning of September but could not recall the exact date.

¶ 43    Ms. Livadic had lunch with Mr. Okic on September 18, 2012, and recalled being very concerned with his appearance at that time, stating: "He was yellow. His eyes were yellow. His skin was yellow. His face, whole body. I got very scared when I saw that." According to her, Mr. Okic had also been vomiting that day, had had a fever off and on, and the drainage from the Jackson-Pratt drain was 20 or 30 milliliters of fluid. Although at other times the fluid may have appeared "light reddish" in color, she said this time it was "[l]ike blood red." She called Fullerton to see if Mr. Okic could get an appointment with Dr. Diniotis that same day, but he did not meet with the doctor again until two days later, on September 20. Ms. Livadic recalled that,

by September 22, when Mr. Okic was finally admitted to the hospital, he was "in a very, very bad condition."

¶ 44                                      5. Dr. Carl Blond

¶ 45     At the time of trial Mr. Okic's expert, Dr. Blond, had practiced as a doctor for over 30 years, was board certified in internal medicine, and worked as the chief hospitalist at a county hospital in San Antonio, Texas. Dr. Blond explained that a hospitalist is the "attending doctor" in charge of a hospital patient; the one who calls on other doctors as needed to assist with the patient's care and who coordinates discharge with the patient's primary doctor and any specialists who will continue to see the patient.

¶ 46     Dr. Blond discussed the acronym "SOAP," used by doctors when they make their rounds on patients. It entails a doctor asking a patient about his or her subjective complaints ("S"), collecting objective data like vital signs ("O"), assessing what is wrong with the patient ("A"), and formulating a plan for treatment ("P"). Dr. Blond explained that when this methodology is followed, the result is "an organized note which another doctor can look at and see what's going on." Not only is this an accepted procedure, but notes taken in this manner are now often required by electronic medical records systems. If any section of the SOAP rubric is not filled in, the system will consider the note to be incomplete. The majority of notes that Dr. Blond sees "are based on this type of system."

¶ 47     Dr. Blond also testified that biliary disease is very common and in his career he has provided postoperative care to hundreds of patients following gallbladder removal surgery. According to Dr. Blond, 90% of such surgeries are laparoscopic. If there are no complications, pain usually subsides within a day and biliary drainage within a few days. "There may be some variation" in the amount of drainage, "but you expect it to progressively improve as the area

heals up and the inflammation goes down." Dr. Blond testified that Mr. Okic's report to Fullerton of 50 to 60 milliliters of drainage every four hours on August 22—four days postsurgery—should have concerned Dr. Diniotis and caused him to order tests to see if there was a serious bile leak.

¶ 48    Dr. Blond explained that bile is excreted by the liver, through the bile duct, to the stomach to aid in digestion. A blockage or leak disrupts this flow, resulting in elevated bilirubin levels, very pale or white stool, and progressively worsening jaundice. When Mr. Okic was admitted to the hospital on September 22, his bilirubin level was 12.5, the upper limit for a normal result being a reading of only 1.

¶ 49    Dr. Blond reviewed Mr. Okic's medical records in this case and the deposition transcripts of Mr. Okic, his family members, and Dr. Diniotis. Consistent with the report he prepared in this case, it was Dr. Blond's opinion, to a reasonable degree of medical certainty, that Dr. Diniotis deviated from the postoperative standard of care. As Dr. Blond explained:

"When I reviewed the records I felt there was a marked deviation due to multiple visits with a bile leak and no diagnostic workup. There was a marked delay in addressing a complication—a known complication of biliary surgery where there is a persistent leak which requires a prompt evaluation and treatment.

The patients that have biliary surgery that I see in a hospital, we get laboratory on them and what we expect is to see that bile drainage gradually taper away fairly rapidly, certainly within a week. And when it's prolonged, we worry. One of the complications of bile duct surgery is, from a number of sources, leaking of the bile. Sometimes it can be fixed by a gastroenterologist. Sometimes it requires surgery. Sometimes a radiologist can be involved.

But you—when you have persistent drainage into your—into the Jackson Pratt drain that's not going away, particularly if it's bilious or, you know, dark brown or greenish brown, you have—after a relatively short period of time and it's persisting after a week, you have to pursue possible diagnoses; and that means not just following up [with] a patient, but doing radiographic studies, checking laboratory tests, doing a careful physical exam of the abdomen, and I felt that this was not done up to the standard of care in this case."

¶ 50    Dr. Blond said that he would have ordered diagnostic tests for Mr. Okic by August 25 at the latest because, "if a patient isn't doing well and it's been a week and they're still draining, you want to pursue an evaluation." According to Dr. Blond, most patients are "back to fully functional and back at work" within seven days.

¶ 51    On cross-examination, Dr. Blond acknowledged that at his deposition he testified that he prepared his report in this case after having reviewed Mr. Okic's medical records from Fullerton, Resurrection, and Rush, but not Dr. Diniotis's own notes. Dr. Blond explained that he may have mistakenly provided that answer based on the list of materials he included in the report. He testified that in actuality he "may well have looked at [Dr. Diniotis's] notes" before rendering his opinions. Dr. Blond insisted, however, that he would have reached the same conclusion even without the notes, based on Mr. Okic's condition when he was finally admitted to the hospital.

¶ 52    Dr. Blond acknowledged that he is a frequent expert witness, reviewing 15 to 30 cases per year. He has been deposed approximately 500 times and has testified at trial between 40 and 60 times, all across the country. However, this was the first case he had ever testified in concerning a gallbladder removal. His specialty is in fact nephrology, the study of the kidney. Although he characterized damage to the common bile duct during gallbladder removal surgery

as a "known complication," he also considered it relatively "uncommon," having himself seen only two cases in the last five years.

¶ 53    Dr. Blond agreed that not every patient will be fully recovered from gallbladder surgery within a week but that "you would expect progressive improvement" during that time frame and that is what a doctor operating within the standard of care would be looking for. He agreed that in Mr. Okic's case, the correct tests were eventually ordered, the correct diagnosis was made, and all of the correct treatment was provided. In his opinion, however, all of this should have happened about 28 days sooner.

¶ 54                                          6. Dr. Edie Chan

¶ 55    Portions of the video evidence deposition of Dr. Chan, a board-certified surgeon at Rush, were also played for the jury. Dr. Chan's testimony, consistent with Rush's records, was that Mr. Okic was admitted on September 27, 2012, for a six-day hospital stay. Mr. Okic presented with "right upper quadrant abdominal pain, jaundice, a bilirubin of 12, and elevated liver enzymes." He was prescribed medication for his pain and two diagnostic tests were performed—an endoscopic retrograde cholangiopancreatography and a percutaneous transchepatic cholangiography. Mr. Okic was diagnosed with an "extrahepatic biliary obstruction [a blockage outside of the liver] due to [a] bile duct injury at [an] outside hospital."

¶ 56    Mr. Okic was discharged from Rush on October 3 and returned for surgery to reconnect his bile duct to his intestines on November 16, 2012. At his final visit with Dr. Chan, on December 18, 2012, Mr. Okic had no complaints and his scar had healed. He was told he could return to work on January 28, 2013.

¶ 57                                          7. Dr. Eric Woo

¶ 58    Dr. Eric Woo, a board-certified general surgeon for 10 years, testified as Dr. Diniotis's

expert. Dr. Woo has provided postoperative care for hundreds of patients following gallbladder removal surgery and teaches postoperative care to doctors in training. Dr. Woo has served as chair of the department of surgery for the hospital where he works in northwest Indiana, which has a surgical staff of between 100 to 150. He was also recently invited to become a fellow in the American College of Surgeons. Dr. Woo stated that he was familiar with both the postoperative standard of care for gallbladder removal patients and the symptoms of a common bile duct injury. In this case he reviewed Mr. Okic's medical records and the deposition testimony of Mr. Okic and his family members, Dr. Diniotis, and Dr. Blond. Dr. Woo's expert opinion, within a reasonable degree of medical certainty, was that, in providing postoperative care to Mr. Okic from August 18, 2012, to September 22, 2012, Dr. Diniotis adhered to the relevant standard of care.

¶ 59 Dr. Woo acknowledged that, at all but one of Mr. Okic's seven postoperative visits, Dr. Diniotis noted that there was bile drainage in the Jackson-Pratt drain. But the doctor's notes also included other information, such as "appetite good, abdomen soft, [and] drainage much less now." Dr. Woo explained that, although the "S-O-A-P" acronym is something medical students are taught to remind them what questions to ask a patient during follow-up visits, not following the methodology precisely in one's notetaking is not a deviation from the standard of care.

¶ 60 Dr. Woo then went through each of the seven follow-up visits that Mr. Okic had with Dr. Diniotis, explaining that in each of them Dr. Diniotis met the standard of care because Mr. Okic appeared to be improving and the doctor continued to monitor his recovery closely. Dr. Woo testified that, contrary to Dr. Blond's views, the normal recovery time for a laparoscopic cholecystectomy is not necessarily one week; nor does the standard of care necessarily require diagnostic testing whenever there is continued bile leakage 10 days after surgery. In Dr. Woo's

opinion, Dr. Diniotis provided appropriate postoperative care to Mr. Okic. He saw Mr. Okic frequently, regularly documented those appointments, and had a plan for Mr. Okic's continued care. When signs of a common bile duct injury presented themselves, Dr. Diniotis promptly had Mr. Okic admitted to the hospital for diagnostic testing. Dr. Woo testified that what happened next, including the reconstruction surgery, would still have been necessary even if the common bile duct injury had been diagnosed sooner.

¶ 61    On cross-examination, Dr. Woo confirmed that he had never testified as an expert witness before. He could not recall, in his 10 years of practice, a situation where a bile duct had been cut or damaged during gallbladder removal surgery. Dr. Woo agreed that his report in this case was prepared, with his help and ultimate approval, by defense counsel. He also acknowledged that it is important for a doctor's notes to be both accurate and complete and that Dr. Diniotis's postoperative notes did not "follow an exact SOAP note." He explained that the level of detail doctors include in their notes "varies greatly" and notes like those taken by Dr. Diniotis are typical for some practitioners.

¶ 62    The jury deliberated and returned a verdict in favor of Dr. Diniotis and against Mr. Okic on both counts. Mr. Okic filed a posttrial motion arguing that he was entitled to a judgment notwithstanding the verdict or, in the alternative, to a new trial. Following briefing and argument, the trial court denied the motion and entered judgment on the jury's verdict.

¶ 63                                II. JURISDICTION

¶ 64    The trial court entered judgment on the jury's verdict on November 17, 2017, and denied Mr. Okic's timely posttrial motion on April 17, 2018. Mr. Okic appealed on May 15, 2018. We have jurisdiction pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 65                         III. ANALYSIS

¶ 66                         A. Motions *in Limine*

¶ 67    In his challenges to the trial court's pretrial rulings, Mr. Okic raises two claims of error: (1) he should not have been completely barred from presenting evidence of surgical negligence to the jury and (2) his sister-in-law, Elvira Okic, should have been allowed to tell the jury about the conversation she had with Dr. Diniotis concerning the effect of his son's recent medical diagnosis on his ability to do his job. We consider each ruling in turn.

¶ 68              1. Taking the Issue of Surgical Negligence Away From the Jury

¶ 69    The trial court in this case concluded that, absent any expert testimony establishing the applicable surgical standard of care, what happened during Mr. Okic's gallbladder removal surgery was irrelevant. The jury knew that Mr. Okic's common bile duct was injured during that surgery and knew that this condition, once detected, required corrective surgery, but the court prevented Mr. Okic's counsel from eliciting any testimony regarding why or how the injury occurred.

¶ 70    It is well settled that in a medical malpractice action, the plaintiff bears the burden of proof for establishing the proper standard of care against which the defendant's conduct is measured, the unskilled or negligent failure to comply with the applicable standard, and a resulting injury proximately caused by the defendant's want of skill or care. *Purtill v. Hess*, 111 Ill. 2d 229, 241-42 (1986). *Johnson v. Ingalls Memorial Hospital*, 402 Ill. App. 3d 830 (2010). It is also established that a plaintiff must generally present the testimony of a qualified expert to satisfy his burden of establishing the standard of care. *Snelson v. Kamm*, 204 Ill. 2d 1, 43-44 (2003). In assessing whether proper expert testimony has been offered, an expert qualified in one area may not be qualified in another area. See *Northern Trust Co. v. Upjohn Co.*, 213 Ill. App. 3d

390, 406-07 (1991) (holding that an emergency physician was not competent to testify regarding the standard of care for an obstetrician in a gynecological ward).

¶ 71    Here, it was undisputed that Mr. Okic's only medical expert, Dr. Blond, was not board-certified in general surgery, had never performed a gallbladder removal surgery, and was—by his own admission—unable to provide testimony regarding the applicable surgical standard of care or whether the injury to Mr. Okic's common bile duct was caused by a deviation from that standard of care. In lieu of the requisite expert testimony, Mr. Okic argued that (1) lay jurors could appraise Dr. Diniotis's conduct without the aid of expert testimony and (2) Dr. Diniotis's comments to Elvira Okic amounted to an admission that he breached the surgical standard of care. The trial court correctly concluded that these arguments lacked merit as a matter of law.

¶ 72    *Prairie v. University of Chicago Hospitals*, 298 Ill. App. 3d 316 (1998), cited by Mr. Okic for the proposition that lay jurors can, in limited circumstances, substitute their own common sense for expert testimony, did not involve a surgical standard of care. The plaintiff in that case was put on bed rest following back surgery. *Id.* at 319. When the plaintiff's doctor changed his order to " 'increase activity' " and " 'up as tolerated with assist,' " the defendant nurse was alleged to have forcibly pulled the plaintiff—who was yelling and pleading that she was in pain and "was going to throw up or faint"—out of bed and tied her to a chair while she made the patient's bed. *Id.* at 319-20. This was clearly not in keeping with the doctor's instructions, and the court concluded that, "under the particular circumstances of [the] case, the alleged negligence [was] so grossly apparent that a layperson [could] readily appraise it using his or her everyday knowledge." *Id.* at 326.

¶ 73    Far more in keeping with the facts of this case is *Walski v. Tiesenga*, 72 Ill. 2d 249 (1978). Although our supreme court noted in that case that expert testimony is not always

required, it went on to find that the kind of medical malpractice case presented there was "not the type of situation in which the common sense of laymen could provide the standard of care." *Id.* at 257. *Walski*, like this case, involved a surgery in which a piece of anatomy was inadvertently and incorrectly severed; the surgeon failed to identify the "left recurrent laryngeal nerve" during thyroid surgery and cut it, resulting in vocal cord paralysis. *Id.* at 252, 255, 257. Our supreme court contrasted that type of situation from malpractice claims in which expert testimony may not be necessary, such as "sponges left in the abdomen, instruments left after surgery, and X-ray burns." *Id.* at 257. Here, even Mr. Okic's own expert, Dr. Blond, acknowledged that injury to the common bile duct, although something to be avoided, is a "known complication" of gallbladder removal surgery. Whether and when the presence of such a complication is the result of medical malpractice is not something a lay juror can decide without expert testimony.

¶ 74 The trial court also properly refused to treat what Dr. Diniotis purportedly said to Ms. Okic as an admission by the doctor that could substitute for such expert testimony. A comment by the doctor that, in hindsight, he felt he was too distracted at the time of the surgery and should not have gone ahead with it suggests *why* he may have deviated from the standard of care, but it is not the same as an admission that he *did* deviate from that standard. And even if—as plaintiff's counsel attempted to reframe the issue at oral argument before this court—the admission was that Dr. Diniotis deviated from the standard of care even by going ahead with the surgery when he may have been distracted, Mr. Okic still had no expert to establish that such a deviation was the cause of Mr. Okic's injury. See *Hemminger v. LeMay*, 2014 IL App (3d) 120392, ¶ 15 (to establish proximate cause in a medical malpractice case, a plaintiff must prove that the defendant's negligence "more probably than not" caused the plaintiff's injury (internal quotation marks omitted)).

¶ 75    Ms. Okic's deposition was not included in the record on appeal. All we know of what she said comes from defense counsel's summary of her testimony in Dr. Diniotis's motion *in limine*: that Dr. Diniotis purportedly told Ms. Okic that "he had made a mistake during the August 18, 2012, cholecystectomy and that he should [not] have been performing the procedure because his son had recently been diagnosed with a brain tumor." Mr. Okic does not dispute this characterization and has pointed to nothing in the record to clarify or add to it. On its own, the paraphrased testimony can in no way be considered a clear admission establishing the applicable surgical standard of care, a breach of that standard, and proximate causation.

¶ 76    The trial court's reasoning on these points was thus legally correct. This reasoning may have formed an appropriate basis, earlier in the case, on which to grant a motion for partial summary judgment in Dr. Diniotis's favor. It likewise would have been an appropriate basis for a directed verdict in the doctor's favor at the conclusion of Mr. Okic's case-in-chief. Procedurally, however, we are troubled by the use of a motion *in limine* to effectively dispose of a large portion of this case on the eve of trial.

¶ 77    As this court made clear in *Cannon v. William Chevrolet/Geo, Inc.*, 341 Ill. App. 3d 674, 681 (2003), "[m]otions *in limine* are not designed to obtain rulings on dispositive matters but, rather, *** to obtain rulings on *evidentiary* matters outside the presence of the jury." (Emphasis in original.) In *Cannon*, the defendant car dealership filed a motion *in limine* seeking to bar any evidence at trial that it had refused to repair the plaintiff's vehicle, on the grounds that she had failed to give proper notice of her warranty claims. *Id.* We concluded that a motion *in limine* was "not the proper vehicle for the relief sought"—*i.e.*, the dismissal of entire claims as a matter of law—and that the defendant had "misunder[stood] the purpose" of such a motion. *Id.*

¶ 78    Here, although presented, argued, and ruled upon as motions *in limine*, Dr. Diniotis's

motions *in limine* Nos. 24 and 25—like the motion presented in *Cannon*—asked the trial court to do more than bar evidence from a specific source. Motion *in limine* No. 24 asked the court "to bar *any* evidence, testimony, questioning, argument or innuendo that Dr. Diniotis was negligent in performing the August 18, 2012 cholecystectomy and/or Dr. Diniotis negligently caused Mr. Okic's common bile duct injury." (Emphasis added.) Motion *in limine* No. 25 asked the court to bar all "evidence, testimony, questioning or argument that Dr. Diniotis 'made a mistake' during the August 18, 2012 surgery." These were not evidentiary rulings but rulings that disposed of an entire theory of liability. The trial court judge acknowledged as much. Sustaining an objection to a portion of Dr. Chan's deposition, in which the doctor was asked about what happened during Mr. Okic's gallbladder removal surgery, the court stated "we have ruled that *that was not going to be part of the cause of action* except for historical purposes." (Emphasis added.)

¶ 79    A dispositive motion filed a week before trial is plainly untimely. See 735 ILCS 5/2-1005(c) (West 2016) (providing the nonmovant with an opportunity to demonstrate the factual basis for his complaint or to establish the existence of one or more genuine issues of material fact); Cook County Cir. Ct. R. 2.1(f) (Aug. 21, 2000) (providing that "except by prior leave of court and for good cause shown," all motions for summary judgment "shall be filed and duly noticed for hearing such that the motion comes before the court for initial presentation and entry of a briefing schedule not later than forty-five (45) days before the trial date").

¶ 80    Here, although Dr. Blond certainly indicated in the report he prepared shortly after the complaint in this case was filed that he would render opinions at trial on both the surgical and postsurgical standards of care, it was clear to all concerned by the time of his deposition in early August 2017 that Dr. Blond had "no intention of reviewing if there was some type of surgical error" in this case. That was still over three months before the trial began.

¶ 81 It is generally reversible error when a trial court grants an untimely motion for summary judgment. As in *Silverstein v. Brander*, 317 Ill. App. 3d 1000, 1005 (2000), it may be apparent from the record that a party has "used the *in limine* procedure solely to avoid the requirements for dispositive motions, although they knew [their] motion was, in effect, a summary judgment motion." Or, as in *Peterson v. Randhava*, 313 Ill. App. 3d 1, 10-11 (2000), where the scope of discovery was narrowly tailored, it may be impossible to say what countervailing evidence the nonmovant might have presented if given notice and time to sufficiently respond to the dispositive motion.

¶ 82 In rare cases, however, granting an untimely dispositive motion styled as a motion *in limine* will simply result in no prejudice. We recognized this possibility in *Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7 (1999). The plaintiffs in that case sued their hospital and doctor for the wrongful death of their stillborn son, alleging that the hospital's nurses should have conveyed certain information to the doctor sooner and the doctor in turn should have decided sooner to deliver the baby by caesarean section. *Id.* at 9-11. One week before trial, the hospital filed a motion *in limine* to bar evidence that its nurses had deviated from the standard of care, on the basis that the plaintiffs had no expert who would testify that such deviations caused the baby's death. *Id.* at 11-12. The trial court granted the motion and the hospital immediately sought and was granted dismissal of the claim against it for a lack of proximate cause. *Id.* at 12.

¶ 83 Although not convinced that the motion *in limine* in *Seef* was really an untimely motion for summary judgment, we assumed, *arguendo*, that even if it was, this was "not [a] ground for reversal where *** no injustice [had] been done to anyone." (Internal quotation marks omitted.) *Id.* at 18. Because the plaintiffs had no expert testimony to prove an essential element of their case, there were "no genuine issues of material fact for a jury to consider." *Id.* at 18-19.

¶ 84    The same is true here. Mr. Okic took discovery on what happened during his cholecystectomy. He knew what all of the witnesses in the case had said at their depositions about that procedure. If there was any other evidence to present or testimony he hoped to elicit at trial that could have properly supported his claim that his common bile duct was injured as a result of Dr. Diniotis's surgical negligence, Mr. Okic had every reason to raise that evidence or anticipated testimony with the trial court in response to the motion *in limine*.

¶ 85    In sum, the trial court erred by granting Dr. Diniotis's motions *in limine* Nos. 24 and 25. The motions were improper and untimely dispositive motions. On the record presented, however, that error does not require reversal because it resulted in no prejudice. As we recognized in *Seef*, "[t]he law does not require the doing of a useless act." (Internal quotation marks omitted.) *Id.* at 20. As we noted was possible in *Seef*, here it is clear that the improper use of motions *in limine* to obtain dispositive rulings resulted in no actual prejudice to Mr. Okic.

¶ 86                              2. Dr. Diniotis's Purported Admission

¶ 87    Mr. Okic also argues that even if the statement by Dr. Diniotis did not establish a breach of the surgical standard of care, Ms. Okic should still have been allowed to tell the jury what the doctor told her as evidence of his mental and emotional state during and after the surgery. It is within the discretion of the trial court to decide whether evidence is relevant and admissible for a particular purpose, and a reviewing court will not disturb the circuit court's decision absent a clear abuse of that discretion. *In re Marriage of Bates*, 212 Ill. 2d 489, 522 (2004). An abuse of discretion occurs only where no reasonable person would take the position adopted by the trial court. *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167 (2003).

¶ 88    We cannot find that exclusion of this evidence was an abuse of discretion. Where, as here, a breach of the standard of care cannot legally be shown, evidence tending to show *why* a

doctor may have breached the standard is simply not relevant. Given Mr. Okic's failure to establish the relevant surgical standard of care, the trial court did not abuse its discretion by barring testimony concerning the purported conversation between Ms. Okic and Dr. Diniotis.

¶ 89 Mr. Okic also argues that this conversation was relevant to show that Dr. Diniotis continued to be distracted by his son's condition during the period of time that he provided postoperative care to Mr. Okic. But defense counsel represented to the trial court that, at her deposition, Ms. Okic only related the doctor's distraction to the time of the surgery. Counsel for Mr. Okic did not refute this, and there is no other summary of the testimony in the record. Mr. Okic has not carried his burden of demonstrating to us that the trial court abused its discretion in disallowing the evidence for this purpose.

¶ 90 B. Sufficiency of the Evidence Supporting the Jury's Verdict

¶ 91 On Mr. Okic's claim of postoperative negligence—the portion of his case that did go to trial—Mr. Okic challenges the trial court's denial of his posttrial motion for a directed verdict or, in the alternative, for a new trial. Although both requests concern the sufficiency of the evidence, different legal standards govern the two forms of relief.

¶ 92 A directed verdict or judgment *n.o.v.* is proper "when all of the evidence, when viewed in its aspect most favorable to the opponent, so *overwhelmingly* favors [the] movant that no contrary verdict based on that evidence could ever stand." (Emphasis added and internal quotation marks omitted.) *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 100 (2010). "In ruling on a motion for a judgment *n.o.v.*, a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion." *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992). If "reasonable minds might differ as to inferences or conclusions to be

drawn from the facts presented," then a directed verdict is inappropriate. *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 351 (1995). We review the denial of a directed verdict *de novo*. *Lazenby*, 236 Ill. 2d at 100.

¶ 93     A motion for a new trial, by contrast, asks the court to set aside the verdict and order a new trial if, after weighing the evidence, it concludes that "the verdict is contrary to the manifest weight of the evidence." (Internal quotation marks omitted.) *Id.* "A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence." (Internal quotation marks omitted.) *Maple*, 151 Ill. 2d at 454. Because a motion for a new trial requires a weighing of the evidence, we defer to the trial court's judgment; "[w]e will not reverse a court's ruling on a motion for new trial unless it is affirmatively shown that the trial court clearly abused its discretion." *Lazenby*, 236 Ill. 2d at 101.

¶ 94     Here, Mr. Okic's motion was properly denied on both grounds. The evidence presented at trial not did not overwhelmingly favor Mr. Okic but, in fact, rested on credibility findings that were within the province of the jury.

¶ 95     In this medical negligence case, Mr. Okic was required to "establish the standard of care by which to measure the physician['s] conduct, and prove, through affirmative evidence, that the defendant[ ] [was] negligent and that the negligence proximately caused [his] injury." *Bosco v. Janowitz*, 388 Ill. App. 3d 450, 459 (2009). Mr. Okic insists that we must disregard Dr. Woo's testimony because it has "no probative force" and does not qualify as "competent evidence," but in support of this evidence he merely recites his own expert's conflicting testimony. As we have stressed, "[w]here the parties offer conflicting medical testimony regarding the applicable standard of care and [the] defendant's breach of that standard, the jury is uniquely qualified to

resolve the conflict." *Swaw v. Klompien*, 168 Ill. App. 3d 705, 711 (1988). Such is the case here, where Dr. Blond and Dr. Woo presented two different views on the applicable standard of postsurgical care.

¶ 96    The result in this case also turned on conflicting lay testimony regarding when Dr. Diniotis was told that Mr. Okic was experiencing symptoms like severe pain, jaundice, and white stools. Mr. Okic and Ms. Okic testified that they made Dr. Diniotis aware of such symptoms as early as September 8, 2012. Dr. Diniotis testified that, according to his notes, he did not receive this information until September 22, when he promptly admitted Mr. Okic to the hospital for diagnostic testing.

¶ 97    The jurors in this case were thus asked to make classic credibility determinations, and we will not substitute our own judgment for theirs in such matters. Mr. Okic has simply not met the high standards for either a judgment *n.o.v.* or a new trial.

¶ 98                                   IV. CONCLUSION

¶ 99    For the reasons stated above, we affirm the judgment of the trial court on the jury's verdict in favor of Dr. Diniotis. Although Mr. Okic also challenges certain limitations the circuit court placed on the evidence of damages he was able to present at trial, he concedes that these issues are only relevant if we reverse and remand the case for a new trial. Because we decline to do so we do not reach them.

¶ 100   Affirmed.